May it please the court, my name is Brian Litmans and I represent Alaska Community Action on Toxics in the Sierra Club. I'll be sharing five minutes of my time with the Environmental Protection Agency and I'd like to reserve three minutes for rebuttal. Alright. This is a straightforward case involving a facility that regularly spills coal from a shiploader and a conveyor into Resurrection Bay. I plan to address three points for why Aurora cannot avail itself of the permit shield. First, the permit does not authorize non-stormwater discharges beyond those expressly identified in the general permit. Let me just ask a question about that. Then do we need to determine whether Aurora adequately disclosed its non-stormwater coal discharges to the EPA? Does the general permit explicitly prohibit coal discharge? I believe the proper interpretation of the general permit is that it does prohibit non-stormwater discharges beyond those explicitly identified in the permit. So we don't need to determine whether it adequately disclosed. I mean, once we find as a fact that the coal was discharged, the permit prohibits it, isn't that correct? I think that is correct. The first prong of Piney Run is whether there's compliance with the permit. Here we have a discharger that's not in compliance with the general permit. It does not contend that it has eliminated the non-stormwater discharge of coal. And there is nothing in the general permit that indicates that the discharge of coal is authorized. If you look at the general permit and you read it as a whole, which is what County of Los Angeles instructs not to look at specific provisions, it's clear that the permit does prohibit additional non-stormwater discharges. The only non-stormwater discharges identified in the permit in Section 1.1.3 are the type that you see in exigent circumstances, like firefighting or nontoxic discharges. And coal doesn't fit any of those categories. The other provision in the permit that Aurora relies upon is Sector A. It is the only sector in the general permit that identifies an additional non-stormwater discharge. All right. Thank you. Well, the district court's analysis was that this is a non-exhaustive list under Part 1.1.3. And so even though coal discharges is not listed, really because the list is non-exhaustive, therefore the issue in this case really isn't whether it's allowed on that list or not. How do you respond to that? Well, I think the district court erred when it interpreted the general permit and what it authorizes. The list under 1.1.3 is the non-stormwater discharges that are identified. And if you look at Sections 5.1.2, 5.1.3, 5.1.3.4, you see that the permit writer in the general permit is trying to be as clear as they can with respect to what discharges are allowed. Section 5.1.2 says that the facility must identify the location and description of all the non-stormwater discharges, ER 313. Section 5.1.3 goes on to say that the facility must identify where those non-stormwater discharges are released. And under Section 5.1.3.4, the discharger must document that they have evaluated for the presence of non-stormwater discharges in the stormwater plan and that all the unauthorized discharges have been eliminated. You know what? Have you finished answering? There is one more section, the most important section, which is Section 2.1.2.10, ER 310, where the permit tells facilities to eliminate unauthorized discharges. What you know and what these facts make fairly clear, nobody wanted to discharge the coal. The coal accidentally and inadvertently was discharged. So what would you say if you wanted to apply for a permit? I gather your feeling is that you should have a permit. What would be the request? They don't want to put coal into the – in fact, they probably lose money when the coal falls over because that's that much less coal that can be sold. So what would they say if they applied for a permit? Well, Judge Ferris, under the Clean Water Act, it's a strict liability statute, and a facility, a discharger must have a permit to discharge any pollutants into waters in the United States. The facility's intent, whether it directly intends to discharge a pollutant out of an outfall or it's an incidental discharge, is irrelevant. The Clean Water Act prohibits it. Certainly so, and one of the reasons for that, and that's an absolutely clear basis, it becomes a part of the clear water when the pollution goes into the water. When the coal goes into the water, it just falls to the bottom of the sea, doesn't it, and stays there. That's a question of what the physical things that are happening. But on this record, don't we see somebody dive down and there was a coal laying right on the bottom? There is coal, but coal is a defined pollutant under the Clean Water Act, and it's falling into waters of the U.S. There's no dispute that under the – that there's a pollutant being – It's passing through waters, but it's not falling by. I think chemically that's inaccurate and wrong. The coal is going to become part of the waters of the United States through part of the solution of water. The record does show that there's a pollutant. Importantly, what the record does show is that there's a pollutant, coal, being discharged. Trying to move the coal from one point to the other, and you do it by passing over the water, and as you do it, some coal spills out of the conveyor and makes its way into the water. And somebody went diving and they found out, yes, the coal is here. It's right on the bottom. It falls, it goes through the water right to the bottom and stays there on this record. On this record, there's also indications from what we've provided. You can see when coal falls into the water in some of the photos that were taken by Sierra Club members that the coal is actually dispersing. It's going to impact the water quality. It's not like coal is some object that just stays in its form once it's in waters of the United States. Importantly, the Clean Water Act prohibits discharges of pollutants, and I don't think that's at issue here. Because it's a pollutant being discharged, unless it is authorized, they must get a permit. They have no permit for the authorization of this discharge regardless of their intent. What would you say when you request the permit? I'm sorry? What would be the request? With respect to getting the permit? Well, under the Clean Water Act, the discharger would apply for a permit, and the agency would evaluate the pollutant discharge, what the threats are, and what appropriate effluent limits need to be attached to address the impacts to waters of the United States. This is just an unusual set of facts. It's not a situation where somebody is polluting. They would like for all the coal to stay in the hopper as it moves down, but it doesn't. It falls over, and some finds its way into the water and settle on the bottom of the sea. On this record? On this record, it does pollute the water. It's a pollutant being added to waters of the United States. I think that question is clear. The intent is irrelevant. The only question is whether they can contend that they eliminate. Make that up. I think it's pretty clear. Okay. Is there any significance, counsel, to the fact that Part 1 says, the following are non-stormwater discharges authorized under the permit, and there's a list. But yet, with regard to Sector A facilities, there's an additional non-stormwater discharge that's allowed. Any significance to that? I don't think there is significance. Again, under County of Los Angeles. Why not? Well, under County of Los Angeles, you have to read the permit as a whole, and I've already identified numerous sections in the permit that describe the agency's intent when writing the permit to instruct facilities to eliminate all unauthorized discharges, including all unauthorized non-stormwater discharges. Sector A may authorize an additional non-stormwater discharge, but what you don't see when you look to Sector A.D. is a list of facility. If you're under Sector A.D., you can discharge these things. It's not in the permit. As a result, Aurora has a stormwater permit that authorizes stormwater discharges and nothing else. If there's any questions with respect to what Aurora was authorized to discharge, it should have brought that to the agency's attention. If you look at the correspondence, if you look at any of the information between EPA and Aurora or the facility, there's never a direct statement from the facility that says we have a non-stormwater discharge of coal. Is it authorized under the stormwater permit? Looking in the record, that statement is not there. If you're a Sector A.D. facility, then under your reading of the general permit, then you go back to Part 1.1.3 and the list of specific things that are permitted to be discharged. Yes, that's correct. And if it's not there, that's the end of the story. That's correct. With just two minutes remaining in my time, I would just like to touch quickly upon the timing. Should the court look to disclosure and contemplation, the appropriate period for adequate disclosure is when the permit is issued. In this case, that means September 2008 when the general permit was issued. And the reason for that is because the permit writers must, during the administrative process for issuance of the permit, be able to contemplate the discharge of the disclosed pollutant. They must understand what that disclosed pollutant is, what the threats to the waters of the United States are, and whether or not effluent limits can be attached. The only period when they can do that is before the permit is issued. For general permits, the EPA cannot add additional effluent limits for new discharges after the permit's been issued. How do they know before the permit is issued that they are at the time that they're already discharging coal at the time they apply for the permit? This facility was. This facility had an individual permit in 1984 and moved to a general permit in 2001 for stormwater discharges. It never contends that it had eliminated coal discharges from the conveyor and shiploader. And so it had an opportunity. When the general permit was rewritten in 2008, it had an opportunity to come to EPA and say, we have a stormwater permit. We would like it to also authorize the non-stormwater discharge of coal. The facility never commented during the general permit period. They never disclosed anything. They never disclosed any non-stormwater discharge of coal ever to EPA. All right. Thank you very much. Thank you. Thank you. May it please the Court. David Galtieri of the Department of Justice on behalf of Amicus Curia United States. I would just like to quickly echo Mr. Lippman's arguments with respect to the fact that these discharges were not in compliance with the permit. And I would just add to that, again, looking at the entire permit and all of the provisions of the permit and the fact sheet for the permit, which serves as a preamble for the permit, it is clear that EPA wrote a permit and EPA said explicitly in the fact sheet that the enumerated non-stormwater discharges that are authorized are an exception to the general exclusion of non-stormwater discharges under the permit. And then you have Section 2.1.2.10, which I'd just like to reiterate, that says you must eliminate all unauthorized non-stormwater discharges or show that you have another NPDES permit for it. So you either have to have it permitted some other way or you have to eliminate it. So the totality of the permit is absolutely clear that it authorizes precious few non-stormwater discharges, which makes perfect sense. This is a general permit for stormwater from industrial activity. The gist of this permit is about stormwater. So we're really pushing the envelope here and I think the sector AD question is a good one. Section 1.1.3, maybe not the greatest drafting you could have imagined in terms of developing an exhaustive list, but I think the totality of the permit shows that there aren't to be any discharges beyond those that are expressly identified in the permit. And if you look at the sector AD discharge, that discharge is another sort of non-toxic washdown of water with no chemicals or anything. It's very similar to the ones in 1.1.3, but it's slightly different for this one industry where they know that that's going to happen. It wouldn't have made any sense to put it in 1.1.3. So the drafting could have been tighter, but the overall... Easier because 1.1.3 suggests that it is an exhaustive list, but yet here you go down the line, the permit, and there's another exception. I think that's right. The sector A exception pops out. That's a fair criticism in terms of drafting. An EPA could draft a better permit and they'll draft a better one the next time around, this having been pointed out. But I don't think it was ever in EPA's contemplation when it wrote this permit that we would get to a case like this where the non-stormwater discharges of solid hunks of coal falling off a conveyor would ever be covered by a general permit for stormwater, that that was ever within a million miles of what they contemplated would be considered. And so the notion that there may be this tiny ambiguity does not blow the door open to sort of an anything goes if you're a sector AD facility. There's no limitation on what your non-stormwater discharges could be. I'll ask you the same question that Judge Nelson asked the appellants. Do we need to get to the issue of disclosure in this case? Well, Piney Run indicates that sort of step one, if you're going to claim the benefit of a shield from liability from a permit, you're going to have to first show that you're in compliance with that permit. And I think there's a strong record here that these discharges are not anywhere near the realm of authorization under that permit. And furthermore, the general permit itself says that the stormwater plan, one way or the other, you have to tell EPA about all your non-stormwater discharges. One part of the permit says you have to list all your authorized ones under the sections where they're authorized. The other section says you have to identify all your unauthorized ones. You won't find either in Aurora's stormwater plan. So they didn't make the disclosure that was required by the permit. So you have a situation of noncompliance. So it's either it never leaves the gate and we don't get there, or if you look at the report that the Fourth Circuit just recently issued that reiterated the stringency of the shield analysis under Piney Run and the fact that it is a two-part test, there the court treated it as, well, this is just so obviously a case of nondisclosure, it wasn't addressed, that we don't need to get to the rest of the analysis here. So either way, either you don't get there at all or it's so clearly a failing under prong one that you never get to prong two in terms of analyzing what the agency might have contemplated. I would like to touch on the point that we sort of emphasize in our brief, which is trying to lend some background and context, and I'm going to try to do this quickly so I don't get into Mr. Litman's rebuttal time. The district court failed to identify the right permitting process here. By looking at the NOI-based process and the stormwater pollution plan process for a general permit, that was the incorrect process. The two-part test for applying the permit shield isn't in dispute here. A discharger must adequately disclose, and EPA must have reasonably contemplated, during the permitting process that a pollutant that is not expressly addressed in the permit will be discharged pursuant to that purpose. The purpose of the shield analysis is to determine whether the discharger gave sufficient evidence to EPA for a court to have a high level of confidence that even though the permit is silent as to this particular pollutant, that EPA actually intended to authorize that pollutant. We're really filling a very small gap here, and the only way you get past the shield is to say the disclosure was so clear and so complete that we have a very high degree of confidence that EPA anticipated when it wrote this permit that it would be issuing those discharges. Here, there's only one permit in play. It's the 2008 stormwater general permit. It's undisputed that was issued as a legal matter in September of 2008. That's when the record closed on the permit. That was the time and the only time, similar to an individual permit, when EPA had the chance to take in information from the dischargers, to consider that information for dischargers to come forward and say, we have XYZ type of discharge and we need it covered by this permit. That's when the public notice and comment process occurs. That is when EPA responds to those comments. That is the only time that that happens. None of that stuff, none of the magic happens with respect to the NOI process and the stormwater pollution plan process. Those documents have a totally different purpose and intent. I'm sorry, Your Honor. What should our disposition be so far as you're concerned? Well, I think you have two choices. Again, I think how we get to the first step of the Piney run analysis, the shield analysis, whether you get there or not, that's not crystal clear to me. It's either we have a situation where they're not in compliance with the permit, they fall at the first hurdle, end of story, but at the very least, if we move to the first prong as to whether there was adequate disclosure, the proper permitting process to look at was that 2008 general permit issuance process through EPA. There's nothing in this record to indicate that any of this information, any of these sort of threads of supposed circumstantial evidence over a 20-year history, that any of that made it to EPA in that administrative process. So it clearly wasn't disclosed. So certainly this ends, this either never gets out of the gate or they fall at the first hurdle, but we don't get to reasonable contemplation because there's just no record here of the disclosures having been made. Thank you. If the panel has no other questions, thank you very much for your time. May it please the Court. My name is John Martin, and I'll be speaking on behalf of the Appalese today. I'm joined at council table by my colleague, Denise Ashbaugh, who represents the Alaska Railroad Corporation. I represent specifically Aurora Energy Services. If I may, I'd like to first react to the question that Judge Nelson asked. The question was, are you claiming that this was a violation of the stormwater permit? I'm a bit confused by council's response. In the record before Judge Burgess, he was looking at, among other items, a 30B6 deposition of the plaintiffs. Here's the question. So is it fair to say then that you're not claiming any violation of the stormwater plan or the stormwater permit at all? Answer, yes. With respect to the appellant's argument, I think I don't want to be unfair to the argument that they're making. I think the argument that they're making is that we're not covered, this particular discharge is not covered by the stormwater permit, by the general permit. And I think much of what's going on in this litigation is that the litigants are actually talking past each other. I think perhaps the resolution of the biggest part of this case turns on the structure of the general permit itself. If I may, I'd like to go through that structure and not simply reiterate what Judge Burgess enunciated in his thoughtful opinion, but go perhaps a little further and respond to what the appellants are saying in their argument. They're suggesting that this sector, what Judge Burgess called the catch-all sector, and I guess I would describe it as a facility-specific sector, is one that ought to be treated just like every one of the other 29 sectors in the general permit. In fact, that's an improper construction of the general permit. This particular sector is to be applied in, quote, atypical circumstances, end quote, and that's at ER 809. What happens with the catch-all facility-specific sector of the permit is that the director looks at individual discharges. And then based on that individual discharge and what EPA sees out there, decides whether or not the general permit should be applied to that individual discharge. It requires the permission of the director. It must be in writing. It must be requested. So it's not like other sectors. And where that takes us, of course, is that it would have been impossible, and really contrary to the structure of the general permit, for someone to have disclosed this, quote, atypical circumstance, end quote, at that point in time when the MSGP, when the general permit was being promulgated. So, frankly, that argument just makes no sense. You're saying you had no idea what was happening? No, no, to the contrary, Your Honor. We wouldn't pretend that we didn't know about our discharge. Nor, I think, would EPA ever suggest, based on this record, that it didn't know about this discharge. We knew about this discharge in 2008. EPA knew about it, as Judge Ferris pointed out, because they had inspected the facility in 1987, issued an inspection report in 1988, discovered coal beneath the conveyor. Second, it's clear from the record that EPA inspected this facility regularly from 2001. That's at ER 1319. EPA knew about this facility. EPA knew about this discharge. If there were an ambiguity, that ambiguity could have been resolved when the director decided to cover this facility with the general permit in that catch-all facility-specific sector. What the general permit allows is, for EPA, when it makes the general permit applicable to an individual site, they can say, We want more information. They can delay determining whether or not a facility is going to be covered by the general permit. And EPA can, in addition to that, simply say, No, we're not going to cover this facility with the general permit. If there were an ambiguity about the nature of that discharge, certainly that ambiguity was resolved at the time when the coverage was dictated in 2009. But I don't see any ambiguity in the language of the general permit in that Part 2.1.2.10 says, You've got to eliminate all non-stormwater discharges that aren't authorized. So then that leads me to the question of, Well, was the coal discharge authorized? Is the list exhaustive or non-exhaustive? And, Your Honor, I think you framed the issue correctly. And it's interesting, the language that you used. And it's the language that's used in the general permit. What it says is that unauthorized discharges are prohibited. And the point is that that's a circular argument on the part of the government. The question is whether or not it's unauthorized. One thing is patently clear from the face of the general permit. Non-stormwater discharges can, in fact, be authorized. It's clear from 1.1.3. Were you authorized to discharge coal? Judge, I think that when on May 15, 2009, EPA granted authorization under the general permit, they granted the authorization for the discharge of coal that was entrained in that which was discharged from the conveyor. Judge, there's no question but what EPA knew at that point in time about this discharge. Was there anything? I mean, a general permit is quite distinguishable from a special permit. You agree it was a general permit? It is. Where in a general permit issued does it indicate, assuming they knew about it because of the prior history, does it indicate that you, as opposed to anybody else with a general permit, because it's not listed as permitted under the general permit, you were authorized to discharge coal? Well, Your Honor, and that's a very fundamental question, and I think it's answered at page 809 of the record. Page 809 is a description of the AD sector, the catch-all sector. And what it says is specifically that the director is allowed to evaluate a particular discharge. He can designate, and that's the word that's used at page 809, that facility as needing a stormwater permit, which is, quote, an atypical circumstance, end quote. It says, quote, your facility may or may not normally be discharging stormwater associated with industrial activity. You must obtain the director's written permission to use this permit prior to submitting an NOI. The record demonstrates that my client obtained that permission, that written permission from EPA to use this particular provision. Judge, I think there are issues in this case. There certainly are significant legal issues. But the record that Judge Burgess reviewed makes clear, without any doubt, that EPA knew about this discharge. We've talked about the 1987 and the 1988 efforts on the part of EPA. I don't think there's any question about knowledge in this case on this record. Thank you, Your Honor. There is. I think somebody didn't know how to deal with it and they decided, all right, we won't deal with it because it's de minimis. It's not so significant. Now the argument is here and the case is before us. Coal has gone in and everybody knew it was spilling. You didn't want it to. Nobody wanted it to. You wanted it to go down your conveyor and get where you wanted it to go. But in the process, there was spillage. Now if it's significant, and the argument is that it is, we don't know on this record how significant it is because the record doesn't show it. But if it's significant and the argument is made to us, what can we say? We look here and we can see, was it permitted? And the answer is no, it's not under any language that's there. Well, Judge, respectfully, I think it was permitted. What is the language that we look to to see that it was permitted? That would be the May 15, 2009 letter from EPA that approves the application of the general permit for this facility. And so right at that point, EPA granted authority. Specifically mentioning coal, I mean, I accept that they knew that you were doing this, but where in the permit did it give you? General permits do not permit discharge of coal. Where in the permit? Can you have different general permits here? Does it specifically mention that you were allowed to continue to discharge coal? Judge, when we're talking about the catch-all provision, the facility-specific provision, Sector AD, we can't know until the director actually provides written authorization what the discharge is. So, Your Honor, it would have been impossible for the general permit itself to identify a specific discharge for that particular sector. It's unlike the other 29 sectors. If we were talking about, for example, Sector O, Sector O specifically says that coal can be discharged from coal piles and recognizes the reality that rainfall drains coal from the coal piles and that, therefore, coal can be discharged. In the general permit in Sector AD, whenever it's applied, in every single instance, we can't know what the discharge is until the director grants authorization under that catch-all provision. And, Judge, we shouldn't be surprised that the catch-all provision arguably includes non-stormwater discharges. It's not just Sector A. Sector J also includes groundwater seepage that's not included in the 1.1.3 list. And that permit, the general permit, is rife with instances where EPA said you can't discharge specific pollutants even though it's clear that those specific pollutants weren't, in fact, on the 1.1.3, quote, exhaustive list as the government would have us believe. What, as we look at this record, is impossible regarding coal that is being discharged accidentally? What is on this? When we look at this record, what do we see regarding coal? Well, Judge, I think what you see is a de minimis discharge of coal. And I think- You're assuming de minimis, and I'm assuming when I read it, I assumed de minimis too. But the argument is that it's not de minimis, that it's substantial, that it's sufficient to create a problem, and everybody knew it, and it's not mentioned anywhere. Well, and, Judge, whether it's de minimis or a lot or substantial or however it is that the plaintiffs choose to argue it, if it's been permitted, if it's been authorized, quantity of the volume- Yeah, but let me see that it was authorized. And I do believe, Your Honor, it's the only way that a facility would be covered under the catch-all provision is through the written authorization akin to the May 15, 2009 letter from EPA to Aurora Energy Services. That's the only mechanism. And, Judge, if there were any question about whether or not we disclosed this, I think the stormwater- I don't think the problem is disclosure. I think the question now is whether it was authorized. And I don't know of another way that EPA could have authorized this discharge using the general permit, particularly that sector. Let me also say that EPA- Why don't you know of any other way? I mean, they could specifically have said, You're authorized to do this, but they didn't. Judge, with due respect, they did. Tell me how they did. What they did is they said, We are authorizing you to be covered by Sector AD. The director, in writing, said, We're authorizing this, and we're going to put certain monitoring requirements that we've developed in response to your particular discharge on you, and that was in the May 15 and the April 6 correspondence from EPA. Correspondence, do they specifically acknowledge that there was coal being discharged and that under this general catch-all provision of the general permit will go ahead and allow you to discharge that coal? Certainly you can read the correspondence in that fashion. And the reason why I say that is because they imposed monitoring requirements that were taken from Sector O. Sector O is that sector which applies to coal piles. So they knew that the monitoring requirements would be monitoring for discharge of coal. I don't think there's any question about what EPA understood that. You know, Judge, if there's a question about how EPA viewed this particular facility prior to the time that the government became involved in this litigation, I think we need only look at the inspection that was conducted in August of 2011. What happened at that inspection is we had an EPA inspector that actually walked the entire length of the conveyor. He looked at the conveyor. He undoubtedly saw the canopy over the conveyor. He undoubtedly saw the wipers. He saw the seals. He saw the shiploader. He understood. He probably saw the debris in the trays that are beneath this conveyor. He undoubtedly understood that this facility was occasionally discharging coal. I think somebody can argue that it really was discharging. The spillage. And that differs from discharge. And so much coal was spilled into the water. But the argument now is that that has somehow contaminated it. Well, we know that divers went down and they saw the coal. It wasn't absorbed into the water. It was collected on the bottom of the whatever the body of water was. But under this record, I think we can understand. I'm at least a third of the court. I won't try to speak for my colleagues yet. We haven't conferred. But I think I understand what happened. But I also think when I look at the record, I have to say nobody mentioned this coal. It's not mentioned anywhere. And it can't be in the catchall because the catchall doesn't include coal. Well, Judge, the catchall doesn't include. Stormwater runoff, and it's not stormwater. Well, Judge, that's a difficult issue. And I don't think, on the record before the court, the court needs to resolve whether or not this is stormwater. Oh, you know we can't say stormwater either. Well, Judge, let me elaborate on that, if I may, a little bit. I think the EPA permit riders were in a difficult situation. What we have here, as we've described, and it was the record before Judge Burgess, we have a conveyor. And what the plaintiffs are complaining about in this particular case is that occasionally what happens is that coal adheres to the conveyor. It flows out the conveyor. It comes back in what's called carryback. The reason it adheres to the conveyor is because it's wet. It's wet from precipitation. That is, I think, at least arguably in the minds of the permit riders at EPA, that's stormwater. Certainly it's caused by precipitation. The other alternative and the other, if you look at footnote six of the reply brief that was provided by the plaintiffs, the other category of discharge that they're complaining about is coal dust that emanates from the shiploader. Well, a couple of reactions to that. First, that was something that was corrected well before this action was filed. That is to say the shiploader was modified, and what they describe as having occurred, for example, in 2006, did not occur at any point in time where this court would have subject matter jurisdiction over that discharge. Second point, that was included in count two. Is your time in that red light telling us? No, I think I've got two minutes, but I'll make this abbreviated, Your Honor. But, you know, when we talk about what happened from the shiploader, the dust from the shiploader, that was included in count two, the airborne coal, and that was an action that was dismissed by Judge Burgess, and it was not appealed before this court. So where I'm going with this point is that the EPA permit writers were in a difficult situation. They had this coal that was dropping occasionally from the conveyor, and they didn't know exactly how to permit. What they did is they chose to use the catch-all provision of the general permit. It was easier for them administratively. They could have, had they chose, required more information. They could have, had they chose, required an individual permit. They thought that this was the most expedient way to permit this facility, and if there's any doubt about how EPA viewed this facility in past years, that inspection that was conducted in 2011 certainly resolved it. This facility was never cited for discharging without a permit. EPA's inspector walked the entire conveyor. This is, by the way, on the heels of having inspected this facility, quote, on a regular basis, end quote, since 2001. They knew about this discharge. They knew it was permitted under the general permit, and it's only recently that EPA has reversed field. Well, what should our bottom line be so far as you're concerned? So far as we are concerned, we believe that Judge Burgess thoughtfully and correctly analyzed this issue. We think this court should conclude that the general permit, particularly this sector, can be read to embrace this particular discharge, whether it's stormwater or non-stormwater. It was known to EPA. And the upshot is that we're entitled to the benefit of the permit shield. Accordingly, we'd ask that Judge Burgess be affirmed. Let me make just one final point in the 15 seconds I have. Actually, you're out of time. You're over time. Oh, just one final point, though, Your Honor, and that is simply that had my clients been asked to get an individual permit, we would have happily obtained an individual permit. This is how EPA chose to permit the facility. All right. Thank you, Your Honor. Thank you very much. Did you divide your time so that EPA has an opportunity to respond? All right. Well, let's see if Mr. Lichtman can answer my question. What I'm interested in hearing is a direct response to the argument that, well, in fact, this was permitted because EPA didn't know quite how to handle it, chose not to ask them to get an individual permit, and instead in the May 1509 letter authorized this kind of discharge under the general permit. How do you respond to that? Aurora mischaracterizes the regulatory process here. When you look at the correspondence between the facility and EPA, you see that the discussion was limited to stormwater. The first permit in 1984 was for runoff from coal piles. That's a stormwater discharge. The correspondence began in December 1999 and carrying through to 2001. When the facility moved to a general permit, every letter talks about stormwater discharges. None of that correspondence, in none of that correspondence, does the facility say we also have non-stormwater coal discharges. You won't find it in the record. So I think it's a complete mischaracterization to say EPA knew about it. EPA didn't know about it. How could you say EPA didn't know about it? Of course they knew about it. You're not suggesting they didn't, are you? I am suggesting that EPA permit writers, at the time that they were drafting the general permit in 2008, were not aware of specific non-stormwater coal discharges at a facility in Alaska when they were writing a multi-sector general permit for facilities nationwide for stormwater discharges. That discharge of coal from the sewerage facility was never brought to the general permit writer's attention. In the administrative process leading to the issuance of the general permit, it was never disclosed. So I am arguing that at the time the permit writers were writing that permit, they did not know that in 1987 and 1988, decades ago, some EPA inspector was on site and found coal under a conveyor. And then two decades later, when they're writing a general permit... They may not have known, but they could have known because it was EPA who went down and saw the coal on the bottom of the sea. Wasn't it? I would... Isn't that what we see? There is coal under the conveyor. It's not disputed. The discharge is not disputed. I would argue... I see them well over time. Who saw it? Isn't that so? I would argue that this is a case about a permit shield. And when it's a permit shield case, it's the facility that bears the burden of establishing whether or not Piney Run is met. It must show both three things. Incompliance, adequate disclosure, and contemplation. There was no adequate disclosure. It's not... It's disingenuous to say they told EPA they had non-stormwater coal when they can't point to a single document. To hold EPA accountable for a two-decade-old inspection is unreasonable when it's an affirmative defense by the facility. Thank you, counsel. Our questioning has taken you over your time, but we very much appreciate the arguments by all counsel in this case. He's responded adequately. I'll review the record again to see what the discussions were at the time that the permit was approved. But I appreciate the arguments. We'll take the matter under submission. Thank you very much. Court is adjourned for the day. Thank you. Thank you.
judges: FARRIS, NELSON, NGUYEN